**IT IS FURTHER ORDERED** that Defendant Dillard's Inc.'s Motion for Summary Judgment [document #32] is **DENIED.**

**Johnene GUTZMAN, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security, Defendant.**

No. 4:99CV535.

United States District Court, D. Nebraska.

Aug. 23, 2000.

Joe M. Hawbaker, Omaha, NE, for plaintiff.

Ellyn Grant, Assistant United States Attorney, Omaha, NE, for defendant.

## MEMORANDUM AND ORDER

KOPF, Chief Judge.

Because the Administrative Law Judge (ALJ) improperly evaluated a treating doctor's opinion, I will reverse the decision denying Plaintiff benefits. I will also remand for further review.

While it may be that the treating physician's opinion should ultimately be rejected when that opinion is properly examined, the ALJ must correctly probe the basis of the doctor's assessment before spurning it. The reasons for my decision that the ALJ did not do so are set forth below.

## I. BACKGROUND

At the time of the hearing, Plaintiff was a thirty-five-year-old woman with a history of diabetes, rheumatoid arthritis and kidney problems, all of which were exacerbated by a pregnancy. She had previously worked as a cashier selling programs at a dog-racing track. It was this type of job that the ALJ believed Plaintiff could perform.

However, if her treating specialist is believed, Plaintiff could not return to work as a cashier. Indeed, what the treating doctor said corresponded with what Plaintiff claimed at the hearing before the ALJ. For example, Plaintiff reported that after sitting for fifteen or twenty minutes, "I could not walk, I'd have to limp." (Tr. at 70.) Plaintiff also testified: "I cannot lift my baby at all." (Tr. at 73.) In order to walk, she normally uses a cane. (Tr. at 74.)

The specialist agreed that Plaintiff could barely walk. He stated that she could lift less than two pounds and he believed that she could not stoop, kneel, crouch or crawl. (Tr. at 263, 265.) While she suffered from diabetes and renal failure, it was the rheumatoid arthritis that primarily caused the pain, joint swelling and stiffness that made her unable to work as a cashier. (Tr. at 237, 242.)

### A. The Treating or Consulting Doctors

Johnene Gutzman[1] has a history of diabetes. (Tr. at 39.) Also, in 1992, she began to suffer foot and ankle pain while in nursing school. (Tr. at 39.) Between 1992 and 1996, this joint pain got worse and "she had generalized achiness involving hand joints, ankles and across the balls of her feet. Furthermore, she noted discomfort getting up after sitting." (Tr. at 39.) These joint problems interfered with her ability to work as a nurse. (Tr. at 39.) Moreover, in 1994, a kidney biopsy revealed "nephrotic syndrome" and "immunocomplex FSGS." (Tr. at 237.)

1. The record shows that Plaintiff's name has been spelled both "Gutzman" and "Gutz-mann." I have used the spelling set forth in Plaintiff's complaint.

In 1996, she was hospitalized. (Tr. at 39.) By then, she had fully developed chronic hypertension and renal disease. She was also pregnant. After nine days, Plaintiff's condition was stabilized. (Tr. at 39.) She was then released from the hospital and told to take bed rest. (Tr. at 39.)

Shortly after the first hospitalization in 1996, Plaintiff was hospitalized a second time. Her kidney function was declining. (Tr. at 39.) The hospital considered that she was "diabetic, with probable lupus, probable ITP, hypertension, and possible preeclampsia." (Tr. at 39–40.) Because of these conditions, a cesarean delivery of the premature baby was recommended and accomplished. (Tr. at 40.) After that, Plaintiff got somewhat better and was released.

In September of 1996, Plaintiff then began to see Dr. Liem–Som Oei, M.D., a specialist in internal medicine, with a subspecialty in renal disease. While her renal problem had gotten somewhat better after the delivery of her child, Dr. Oei's office notes indicate that "the patient was seen on September 26, 1996" and "can hardly work because of generalized pain, severe morning stiffness," and "a problem with driving." (Tr. at 224.) Dr. Oei observed that a "positive ANA rheumatoid factor[2] [was] noted at the end of the pregnancy." (Tr. at 224.)

In addition, he observed that in 1994 Plaintiff also had a positive ANA rheumatoid factor. (Tr. at 224.) He further recognized that she had a positive ANA rheumatoid factor in January of 1996. (Tr. at 225.) This was true as well in September 1996. (Tr. at 224.) Dr. Oei carefully recorded the specific laboratory values for each of these tests.

On December 16, 1996, Dr. Oei diagnosed Plaintiff. He found that she was suffering from, among other things, "Sjogren's syndrome[3] with [a] variant of rheumatoid arthritis,[4] not responding to Prednisone and Methotrexate." (Tr. at 225.)

As a part of his treatment of Plaintiff, Dr. Oei also consulted Robert Chad Wisco, M.D., another internist, who has a subspeciality in rheumatology. After examining Plaintiff once, on December 30, 1996, Dr. Wisco informed Dr. Oei that he found "[d]iffuse musculotendinous achiness" that was "quite consistent with fibromyalgia."[5]

---

2. Although not conclusive proof of rheumatoid arthritis, "[r]heumatoid factor is an antibody found in the blood of about 80 percent of adults" who have the disease. Arthritis Foundation, *Rheumatoid Arthritis (RA)*, (2000), <http: //www.arthritis.org/ answers/diseasecenter/ ra.asp>. *See also* Arthritis Foundation, *Arthritis Today "On Call" — What ANA Test Means*, (2000), <http:// www. arthritis.org /readarthritistoday/ at_on_call_part2.asp# 19> ("A positive ANA test result indicates the presence of special proteins called antinuclear antibodies in the blood which are associated with autoimmune diseases, such as rheumatoid arthritis or lupus.").

3. "Sjogren's syndrome" is "an arthritis-related disease" that most commonly affects moisture-producing glands, such as the eyes and the mouth. Arthritis Foundation, *Sjogren's Syndrome* (2000), <http:// www.arthritis. org/ answers/ readarthritistoday/ 2000_07_08_101_sjogrens.asp> "It can cause extremely dry eyes" and "extremely dry mouth and throat." *Id.* After Dr. Oei's diagnosis of Sjogren's syndrome, a rheumatologist, Dr. Wisco, found that Gutzman "continues to have dry eyes and dry mouth." (Tr. at 234.)

4. Rheumatoid arthritis is a systemic disease that affects the entire body and is one of the most common forms of arthritis. It is characterized by the inflammation of the membrane lining the joint, which causes pain, stiffness, warmth, redness, and swelling. The inflamed joint lining, the synovium, can invade and damage bone and cartilage. Inflammatory cells release enzymes that may digest bone and cartilage. The involved joint can lose its shape and alignment, resulting in pain and loss of movement. Arthritis Foundation, *Rheumatoid Arthritis (RA)* (2000), <http://www.arthritis.org/answers/diseasecenter/ra.asp>.

5. This is "a common form of generalized muscular pain and fatigue" and "is a form of soft-tissue or muscular rheumatism rather than arthritis of a joint." Arthritis Foundation, *Fibromyaligia* (2000), <http:www.arthritis.org /answers/diseasecenter/ fibromyalgia.asp>.

(Tr. at 235.) He also found "[p]ossible systemic inflammatory process" and "[b]ilateral foot pain." (Tr. at 235.) The doctor was uncertain whether the problem was "fibromyalgia" or a "systemic inflammatory process." (Tr. at 235.)

According to Dr. Wisco, it would be "easy to treat Gutzman as if she has a systemic inflammatory process" given "some of her serologic studies." (Tr. at 235.) But, since she had not responded well to high-dose medicines designed for that problem, Dr. Wisco was uncertain. (Tr. at 235.) Nevertheless, he prescribed Prednisone to see if she would respond. (Tr. at 235.) If she did respond, he intended to suggest more aggressive drugs designed to deal with inflammatory disease. (Tr. at 235.) If not, he would treat her as suffering from fibromyalgia. (Tr. at 235.) Dr. Wisco did not express an opinion regarding disability, and there is apparently no record that he saw her again.

On January 26, 1997, Dr. Oei informed the social security administration that Gutzman "is totally disabled." (Tr. at 41.) "[She] is unable to lift," "[u]nable to carry or handle object[s]," had limited ability to travel, and could not work in a hazardous environment. (Tr. at 41.) At that time, she "[was] still very symptomatic"; that is, she had "rheumatoid arthritis with polyarthralgia" and "joint swelling." (Tr. at 41.) In addition, she had "uncontrolled diabetes mellitis secondary to Prednisone therapy used for the rheumatoid arthritis, Sjogrens syndrome." (Tr. at 41.)

On February 12, 1997, Plaintiff saw Dr. Oei again. He noted that she was "still having polyarthralgia." (Tr. at 239.) Because she was gaining a great deal of weight when taking Prednisone, the doctor changed her medications. (Tr. at 239–40.) This medical record again recited laboratory tests that were positive for rheumatoid arthritis. (Tr. at 240.) The doctor also noted that in September of 1996 he had seen Gutzman and she "could hardly walk because of generalized pain, severe morning stiffness." (Tr. at 239.)

On April 2, 1997, Dr. Oei again expressed the opinion that Plaintiff was disabled. (Tr. at 42.) He stated that she "[was] disabled because of her severe arthritis, diabetes and renal failure." (Tr. at 242.) He stated that Plaintiff could not lift, carry, kneel, crawl or climb. (Tr. at 242.) According to various laboratory tests, the values from which were listed by the doctor, the patient "was found to have [a] high positive rheumatoid factor." (Tr. at 242.) The doctor's letter said that he enclosed copies of the lab tests conducted in 1996, as well as three outpatient records for 1997. (Tr. at 242.)

On July 8, 1997, Dr. Oei completed a "Medical Assessment of Residual Functional Capacity." (Tr. at 42.) The assessment instrument was a long form with blanks that the doctor completed in his own handwriting. The form appears to have been prepared by counsel for Plaintiff. In this evaluation the doctor repeatedly emphasized that lab tests confirmed his opinion. (Tr. at 264, 266, 267.) Those lab tests included tests for rheumatoid arthritis.

In that submission, the doctor stated that Gutzman could only lift or carry items weighing less than two pounds. (Tr. at 263.) According to Oei, she could not stand or walk without undue pain or effort in an eight-hour day. (Tr. at 264.) He stated that she could never climb, stoop, crouch, kneel, crawl or reach overhead. (Tr. at 265.) She could not reach, handle, push, pull, or bend forward or downward at the waist. (Tr. at 265.) Dr. Oei stated that Gutzman could not use her upper extremities and hands for repetitive actions such as grasping, pushing or pulling or fine manipulation. (Tr. at 266.) The doctor stated that he had restricted her from full-time work activity. (Tr. at 267.)

### B. The Social Security Doctor

Two doctors employed by Defendant reviewed Plaintiffs' medical records, but they did not examine her. (Tr. at 46.) The ALJ followed the opinion of the second

medical consultant who reviewed the medical records after Plaintiff sought reconsideration. (Tr. at 47.)

This doctor found that Plaintiff was able to lift twenty pounds occasionally and ten pounds frequently. (Tr. at 46.) In addition, she could stand or walk at least two hours in an eight hour day and she could sit six hours in a day, but she had to be able to periodically alternate sitting and standing to relieve the pain. (Tr. at 46.) She was unlimited in her ability to push or pull, but she should only occasionally crawl, crouch, kneel, stoop, or climb ramps and stairs. (Tr. at 46–47.) She was prohibited from climbing ladders and the like. (Tr. at 47.) She also had environmental restrictions like avoiding extreme heat. (Tr. at 47.)

## C. The ALJ Discounts Dr. Oei's Opinion

The ALJ rejected Dr. Oei's opinion and discredited Gutzman's complaints of disabling pain as a result. Instructing the vocational expert to follow the Social Security doctor's opinion, the ALJ found that Gutzman could return to her work as a cashier. (Tr. at 46–48.)

The ALJ rejected Dr. Oei's opinions for two reasons. First, "[d]espite reporting laboratory findings, no actual findings were included in the medical evidence...." (Tr. at 44.) Second, referring to the July 8, 1997 assessment by Dr. Oei, the ALJ "consider[ed] such evaluation by 'box' category' [sic] to be deficient." (Tr. at 44.)

## II. ANALYSIS

■ "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight." *Cunningham v. Apfel,* 222 F.3d 496, 502 (8th Cir. 2000) (reversing denial of benefits because the ALJ failed to credit treating physicians' opinions that the plaintiff suffered from diabetic neuropathy and disabling depression) (citations omitted). "In fact, it should be granted controlling weight if it is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with the other substantial evidence in the record." *Id.*

■ Consistent laboratory tests can provide the objective medical support necessary to corroborate a treating doctor's opinion. *See, e.g., Ross v. Apfel,* 218 F.3d 844 (8th Cir.2000) (publication page references not available) (reversing denial of benefits because objective medical records, such as "hematocrit lab values," supported treating physician's testimony that claimant suffered from the most severe form of sickle cell anemia and ALJ improperly disregarded that testimony). Other clinical data, such as observations when the patient seeks treatment, can provide appropriate objective medical corroboration as well. *See, e.g., Singh v. Apfel,* 217 F.3d 586, 590 (8th Cir.2000) (reversing denial of benefits because treating physician's diagnosis of persistent nerve root irritation and recurrent herniated disc was improperly discounted; finding that wrongly discounted diagnosis was "amply supported by clinical data" and the patient "had consistently sought medical treatment for his pain and undergone numerous procedures, including surgery, to alleviate the pain").

This case includes numerous lab tests that corroborate Dr. Oei's opinion. As Dr. Wisco noted, it would be "easy to treat [Plaintiff] as if she has a systemic inflammatory process" given "some of her serologic studies." (Tr. at 235.) The record also contains clinical observations that buttress Oei's opinion. For example, Dr. Oei observed the patient and concluded that she could barely walk because of the arthritic pain. (Tr. at 237.) Still further Dr. Wisco found that Plaintiff "continues to have dry eyes and dry mouth," (Tr. at 234), and this clinical observation is consistent with "Sjogren's syndrome," an arthritis-related disease that most commonly affects moisture-producing glands, such as the eyes and the mouth.

With the foregoing factors in mind, I must decide whether the ALJ properly evaluated Dr. Oei's opinion. For the following reasons, I find that he did not.

### A. Laboratory Values

■ Initially, the ALJ rejected Dr. Oei's opinion because "[d]espite reporting laboratory findings, no actual findings were included in the medical evidence." (Tr. at 44.) Respectfully, this statement is both inaccurate and perplexing.

In a December 1996 medical record, Dr. Oei described by date and specific value the lab tests from 1994 through 1996 that were positive for rheumatoid arthritis factors. (Tr. at 224–25.) In a February 1997 medical record, Dr. Oei again specifically described the test values tending to show rheumatoid arthritis. (Tr. at 240.) In addition, on April 2, 1997, in a letter to the state disability determination section, Dr. Oei again specifically described the laboratory values tending to show rheumatoid arthritis and he said that he enclosed those lab tests. (Tr. at 242.) Still further, Dr. Wisco used the lab tests himself. (Tr. at 235.)

In short, the evidence establishes that the actual laboratory findings tending to establish rheumatoid arthritis had been completed, the lab tests corroborated Dr. Oei's diagnosis, the lab values were described in detail by Dr. Oei, the lab values were used by a consulting doctor, and some of the lab tests had even been mailed to the government by the treating doctor. Therefore, the ALJ simply misread the record when he discounted Oei's opinion because "no actual findings were included in the medical evidence." (Tr. 44.)

Still further, even if "no actual [laboratory] findings" had been provided, this was not a reason to discredit the doctor's opinions. Clearly, and repeatedly, the doctor referred to, interpreted, and relied upon the laboratory tests. If the ALJ thought the absence of specific laboratory records was important to a fair review of the treating doctor's opinion, he was obligated to seek them out. *See, e.g., Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir.1990) ("It is the ALJs' duty to develop the record fully and fairly, even in cases in which the claimant is represented by counsel[;]" remanding with direction to the ALJ to seek relevant and legible medical records) (citation omitted); Social Security Ruling 96–5p, 61 Fed.Reg. 34471, 34474 (July 2, 1996) (also available at 1996 WL 362206) ("Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion.").

In summary, reversal and remand are required because the ALJ improperly discredited Dr. Oei's opinion for failing to provide laboratory findings. The doctor did provide them and they supported his opinion. Moreover, if there was some question about the records, the ALJ should have sought them out before rejecting the doctor's opinion.

### B. The Form

■ The ALJ also discounted Dr. Oei's opinion because he used a form. (Tr. at 44.) Without a citation to the case, the ALJ quoted an opinion from the Eighth Circuit Court of Appeals that due to the "interpretative problems" inherent in "physical and mental capacity forms," they are "entitled to little weight." (Tr. at 44.) Once again, this reason for rejecting the doctor's opinion is insufficient.

First, Dr. Oei not only used a form, he also provided narrative letters, and medical records, to express his opinion. Therefore, there was no reason to discount the doctor's opinion because the ALJ did not like one of numerous methods the doctor used to state his consistent views. Second, the form itself contained Dr. Oei's handwritten responses and those handwritten responses referred to the other medical

records, such as the lab tests. Thus, the form was not merely a "check-the-box" expression of opinion as implied by the ALJ. Third, although the ALJ did not provide a citation to the Eighth Circuit opinion that he quoted, the case he apparently relied upon stands for the proposition that a checklist used by a non-treating physician to deny disability benefits will be given little weight when it conflicts with the records of the treating physician. *See O'Leary v. Schweiker,* 710 F.2d 1334, 1341–42 (8th Cir.1983) ("Because of the interpretative problems inherent in the use of forms such as the physical capacities checklist, ... they are entitled to little weight[;]" the ALJ must attempt to "reconcile the medical reports" of the "treating physician ... with those of the consulting physician.") (citations omitted). Here, the "checklist" confirms the treating doctor's opinion: it does not detract from it. Fourth, if the ALJ had questions about the form, he should have sought clarification rather than rejecting the opinion. *Burtalo v. Shalala,* No. 3–94–CV–8012, 1995 WL 324695 (S.D.Iowa March 8, 1995) (rejecting "box category" criticism advanced by an ALJ where the form proved disability; stating that the ALJ should have more fully developed the record if he was dissatisfied with the form). *See also Bishop v. Sullivan,* 900 F.2d at 1262; Social Security Ruling 96–5p, 61 Fed.Reg. 34471.

In summary, reversal and remand are also required regarding the form question. The ALJ improperly discounted the treating doctor's opinion because that doctor used a form. On the facts of this case, the use of such a form did not detract from the sufficiency of the doctor's opinion and, even if it did, the ALJ should have sought clarification rather than rejecting the opinion.

### III. CONCLUSION

In the first instance, it is for the ALJ to decide whether the treating doctor's opinion is well-founded. Because the reasons for disregarding the treating doctor's opinion are insufficient, but I cannot state with certainty that benefits must be awarded, remand is required.

IT IS ORDERED that, by separate document, judgment will be entered for Plaintiff and against Defendant pursuant to the fourth sentence of 42 U.S.C. § 405(g), reversing the decision appealed from and remanding this case for another hearing.