**Judith L. VONBUSCH, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security Administration, Defendant.**

**No. 4:00CV3062.**

United States District Court,
D. Nebraska.

Feb. 21, 2001.

---

**7.** However, the Court does wish to briefly address the defendant's contention that the plaintiffs do not have a private right of action pursuant to the Lead–Based Paint Poisoning Prevention Act (LBPPPA), 42 U.S.C. §§ 4821–22. Few courts have addressed the issue of whether claims arising under the LBPPPA can be asserted as 1) a § 1983 action; and/or 2) an implied private right of action. Those that have addressed this issue have found that the LBPPPA creates an enforceable right (by Section 8 tenants) that can be asserted under § 1983 and/or as an implied private right of action. *See, Davis v. Philadelphia Housing Authority,* 121 F.3d 92 (3rd Cir.1997); *Aristil v. Housing Authority of the City of Tampa, Florida,* 54 F .Supp.2d. 1289 (M.D.Fla.1999); *Simmons v. Charleston Housing Authority,* 881 F.Supp. 225 (S.D.W.Va.1995); *Hurt v. Philadelphia Housing Authority,* 806 F.Supp. 515 (E.D.Pa.1992); *see also, Elliot v. Chicago Housing Authority,* 1999 WL 519200 (N.D.Ill. 1999). This issue has not been addressed by the Eighth Circuit Court of Appeals nor does this Court believe by any district court within the Eighth Circuit. The Court addresses this issue only for informative purposes and does not render any dispositive opinion on this issue.

Warren L. Reimer, Norfolk, NE, for plaintiff.

Elyn Grant, Assist. U.S. Atty., Omaha, NE, for defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This is a social security appeal filed by Judith L. Vonbusch ("Vonbusch" or "Plain-

tiff") for judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Vonbusch's claim for disability benefits under Title II and supplemental security income under Title XVI because Vonbusch was not under a "disability," as defined in the Social Security Act, 42 U.S.C. ¶¶ 401 *et seq.* Vonbusch argues on appeal that the ALJ improperly assessed her credibility under *Polaski v. Heckler*, 751 F.2d 943 (8th Cir.1994) (subsequent history omitted), failed to give appropriate weight to the opinions of her treating physician, erred in discounting the testimony of her husband, and erred in finding that her migraine headaches, arthritis, and hypertension were non-severe impairments.

## I. BACKGROUND

### A. Procedural Background

This suit involves two applications under the Social Security Act. The first is an application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401 *et seq.* (Tr. 122–24.) The second is an application for supplemental security income (SSI) based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381. (Tr. 369–72.) Vonbusch's applications were denied initially on October 3, 1997 (Tr. 89–92, 373–74), and on reconsideration on December 2, 1997 (Tr. 95–99, 375). On July 30, 1998, following a hearing, an administrative law judge (ALJ) found that Plaintiff was not under a "disability" as defined in the Social Security Act[1] at any time through the date of the decision. (Tr. 15–29.) On January 14, 2000, the Appeals Council of the Social Security Administration denied Plaintiff's request for review. (Tr. 5–6.) Thus, the decision of the ALJ stands as the "final decision" of the Commissioner of the Social Security Administration. Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the

Commissioner under Title II. Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review of the Title XVI claim to the same extent as the Commissioner's final determination under Section 205.

### B. Findings by the ALJ

The ALJ evaluated Vonbusch's claims according to the five-step sequential analysis prescribed by the social security regulations. 20 C.F.R. §§ 404.1520(a)-(f); *see also, Bowen v. Yuckert*, 482 U.S. 137, 140–42, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (describing the five-step analysis). With regard to step one, the ALJ found that Vonbusch had not performed substantial and gainful work activity since May 7, 1997. (Tr. 16.) At step two, the ALJ found that Vonbusch had a personality disorder, depression, and a history of alcohol addiction. These impairments imposed more than slight limitations on her ability to perform work activities, and were thus "severe" under the regulations. (Tr. 19, 27.) In addition, the ALJ found that Vonbusch had arthritis and occipital neuralgia, although these impairments did not impose more than slight limitations on her ability to perform work activities for any period of 12 continuous months, and thus were "non-severe" under the regulations. (Tr. 19.) At the third step, the ALJ found that Vonbusch's impairments, individually or in combination, did not meet or equal the criteria of any impairment listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 28.) This finding was in part dependent upon the ALJ's determination to reject the opinion of one of Vonbusch's treating physicians.

As some of Vonbusch's impairments were severe but did not meet or equal the listings, the ALJ's evaluation moved to the fourth step. The ALJ found Vonbusch's subjective allegations as they affected her ability to do work not credible, and found

---

**1.** The definitions of disability for purposes of disability benefits and Supplemental Security Income benefits are identical. *Woolf v. Sha-*

*lala,* 3 F.3d 1210, 1213 n. 4 (8th Cir.1993) (citing 20 C.F.R. § 404.1505 *et seq.* (disability) and § 416.905 *et seq.* (SSI).)

that Vonbusch has the residual functional capacity (RFC) for frequent lifting/carrying of up to 10 pounds and occasional lifting/carrying of up to 20 pounds; for sitting (with normal breaks and meal period) for 6 hours in an 8–hour work day; and for standing and/or walking (with normal breaks and meal period) for 6 hours in an 8–hour work day. (Tr. 25, 28.) The ALJ additionally found that Vonbusch was moderately limited in the ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, interact appropriately with the general public, and to accept instructions and respond appropriately to criticism from supervisors. (Tr. 25, 28.) After considering the testimony of a vocational expert, the ALJ found that Vonbusch's RFC permitted her to perform her past relevant work as a secretary, receptionist, bookkeeper, telemarketing manager, and claims adjuster, and that she was thus not "disabled" as defined by the Social Security Act. (Tr. 27–28.) Since Vonbusch's RFC permitted her to perform past relevant work, benefits were denied at step four of the sequential analysis.

## C. Factual and Medical History

In her August 1997 disability report, Vonbusch alleged that she was disabled since May 7, 1997, because of hypertension, a nervous condition, arthritis, depression, a thyroid condition, and migraines. (Tr. 140.) At the time of the administrative hearing on June 2, 1998, Vonbusch was 45 years old and had a high school education. (Tr. 39.) Her employment history included work as a secretary, receptionist, bookkeeper, sales clerk, telemarketing manager, and claims adjuster. (Tr. 16, 41–45, 155–59.) She quit her last job, as a bookkeeper at her mother's business, on May 7, 1997, because of sexual advances by her step-father (who worked at the same business), and because she was

upset by a poor job performance evaluation. (Tr. 45–47.)

Nobel Swanson, M.D., saw Vonbusch on December 13, 1994, at which time he prescribed weight loss medication. (Tr. 365.) There is no record of further treatment until a year later, on December 12, 1995, when Vonbusch reported that she had injured her back and hip in a fall. (Tr. 365.) Vonbusch was taking Prozac for stress. (Tr. 365.) Her blood pressure was high at 200/110,[2] for which Dr. Swanson prescribed the hypertension medication Tenormin. (Tr. 365.) Dr. Swanson's notes from the visit contain no objective findings regarding Vonbusch's musculoskeletal complaints or mental status. (Tr. 365.)

Dr. Swanson's notes indicate that he next saw Vonbusch on March 28, 1996, at which time her blood pressure was within normal limits at 132/80. (Tr. 232.) Vonbusch complained of continued hip pain. (Tr. 232.) On examination there was tenderness of the hip joint, but no evidence of bruising or swelling. (Tr. 232.) An x-ray of the left hip was negative. (Tr. 220.) Dr. Swanson suggested Vonbusch use heat and take Advil for pain. (Tr. 232.) He continued to prescribe Prozac and Tenormin. (Tr. 232.)

Although Vonbusch "stopped in" at Dr. Swanson's office for Prozac samples on August 28, 1996 (Tr. 232), she was not otherwise seen at Dr. Swanson's office for a period of approximately seven months, until a blood pressure check on October 22, 1996 (Tr. 231). On that occasion, her blood pressure was high at 166/108, and the hypertension medication Covera was prescribed in addition to Tenormin. (Tr. 231.) A follow-up blood pressure check on November 4, 1996, found Vonbusch's blood pressure to be near normal limits at 142/90. (Tr. 231.) On May 27, 1997, Dr. Swanson's office phoned in a prescription for Ambien for Vonbusch, to help her

---

**2.** Hypertension is generally indicated by a blood pressure at or in excess of 140 mm Hg systolic and/or 90 mm diastolic (140/90). The Merck Manual of Diagnosis and Therapy, 416 (16th ed.1992).

sleep, although she apparently was not seen at that time. (Tr. 230.)

On June 9, 1997 (after the alleged onset of disability on May 7, 1997), Vonbusch was treated for strep throat at the St. Elizabeth Community Health Center emergency room. (Tr. 213.) Her blood pressure on this visit was within normal limits at 116/72. (Tr. 214.) Vonbusch was given injections of Demerol and Vistaril, which improved her strep symptoms, and she was released with a prescription for antibiotic and pain medication. (Tr. 213.) On June 17, 1997, Vonbusch was seen by Dr. Swanson for a rash. (Tr. 230.) Dr. Swanson believed the rash was secondary to Vonbusch's strep infection and did not recommend further treatment. (Tr. 230.)

On September 30, 1997, Vonbusch was seen by Dr. Swanson for a "general" checkup. (Tr. 229.) Her blood pressure was within normal limits at 132/76. (Tr. 229.) The physical examination was "normal," and while Vonbusch complained of pain with ambulation, Dr. Swanson noted that she had an adequate range of motion of her extremities. Although his examination notes do not indicate that he performed a mental status examination, and no clinical observations are noted, Dr. Swanson indicated that Vonbusch had chronic depression, extreme anxiety reactions, and migraine headaches two to three times a week. (Tr. 229.)

On November 3, 1997, at the request of State Disability Determination Services, William Stone, Jr., Ph.D., performed a consultive psychological evaluation. (Tr. 234–40.) Vonbusch reported taking antidepressant medication because of anxiety, and having a history of alcohol and drug abuse. (Tr. 235, 239.) She claimed to have reduced her alcohol consumption, but admitted that she still drank heavily two or three times a week. (Tr. 235.) She stated that drinking alcohol worsened her depression and her migraine headaches. (Tr. 236, 238.) On mental status examination, Vonbusch gave "a history of being dishonest with her own physician." (Tr.

238.) She was well-oriented and her level of intellectual functioning appeared to be in the average range. (Tr. 238.) Her conversation was generally goal-directed and there was no evidence of impaired memory. (Tr. 238.) Dr. Stone opined that Vonbusch's primary problem was substance abuse, and that she had a fairly severe mixed personality disorder. (Tr. 239.) Dr. Stone stated, however, that Vonbusch "probably does not have any substantial permanent impairment at this point. . . ." (Tr. 240.)

On February 12, 1998, Vonbusch's attorney submitted several checklist forms completed by Dr. Swanson on January 22, 1998, variously entitled: Medical Impairment Evaluation, Physical Capacities Evaluation, Mental Residual Functional Capacity Assessment, and Medical Statement of Ability To Do Work Related Activities (Mental). (Tr. 241–67.) On these various checklists, Dr. Swanson indicated that Vonbusch was precluded from any type of employment because of impaired memory and concentration; marked limitations in the ability to understand, remember, and carry out short and/or detailed instructions; marked limitations in the ability to interact appropriately with co-workers, supervisors, and the general public; marked limitations in the ability to adapt to changes in work settings; the inability to lift or carry objects weighing up to 10 pounds; inability to sit, stand, and/or walk for even one hour in a work day; and the inability to bend, squat, crawl, climb, reach above shoulder level, or use her hands to perform tasks requiring fine manipulation or grasping. (Tr. 242–67.)

On March 16, 1998, Vonbusch was seen by Terry Rounsborg, M.D., at Bryan Memorial Hospital for complaints of tingling of her tongue, right neck and shoulder pain, intermittent swishing sensation in the right ear, and intermittent episodes of dizziness. (Tr. 304–09.) A chest x-ray revealed no acute changes and an ECG (electro-cardiogram) showed normal sinus rhythm. (Tr. 305, 308–09.) Vonbusch's

blood pressure was 202/87. (Tr. 305.) On examination, Vonbusch complained of pain or palpation of the right trapezius area and lateral cervical area; however, there was no evidence of any neurological deficits and Vonbusch had a good range of motion and strength in all areas of extremities. (Tr. 306.) A faint cardiac murmur was heard, although an echocardiogram revealed nothing more than minimal left ventricular hypertrophy. (Tr. 302, 306.)

On March 19, 1998, Vonbusch was admitted to Bryan Memorial Hospital for right facial weakness and tingling of the left lips and fingers of the right hand. (Tr. 360–61.) Neurologist Lew Birkmann, M.D., found no evidence of mental changes and Vonbusch was observed to be fully alert, oriented, and cooperative. (Tr. 358–59.) Dr. Birkmann noted right peripheral type facial weakness and a very slight trace of an internuclear ophthalmoplegia. (Tr. 358.) There was a slightly dysarthric quality to Vonbusch's speech due to facial weakness, but no aphasic quality. (Tr. 358.) Vonbusch had full strength in upper and lower extremities. (Tr. 358.) Cerebellar testing and all reflexes were normal. (Tr. 358.) Blood pressure was 159/78. (Tr. 358.) Diagnostic testing produced largely normal results: an MRI of the brain was normal except for mild sinus mucosal thickening; carotid dopplers were normal; visually evoked potentials and brain stress auditory evoked responses were normal; lumbar spinal tap was normal; and an x-ray of the cervical spine was negative. (Tr. 319–44, 350, 355.) Laboratory studies were negative for Lyme Disease or any thyroid dysfunctions. (Tr. 342–45, 355.) Dr. Birkmann's presumptive diagnosis was post-infectional cranial neuritis and he started Vonbusch on a course of steroid therapy. (Tr. 355.) Upon discharge on March 24, 1998, Vonbusch continued to have facial paresis, but her ocular disturbances appeared to be resolved. (Tr. 355.)

Dr. Birkmann saw Vonbusch for follow-up on April 7, 1998, at which time he noted only mild right facial weakness, no significant nystagmus, full extraocular movements without any imbalance or complaint of diplopia, and normal speech and orientation. (Tr. 352.) Vonbusch's blood pressure was within normal limits at 120/76. (Tr. 352.) Dr. Birkmann concluded that there was significant improvement in Vonbusch's right facial pain and weakness. (Tr. 352.)

While Dr. Birkmann's progress notes indicate that Vonbusch experienced episodes of increased head pain, for which Florinal was prescribed (Tr. 349), when Vonbusch was last seen by Dr. Birkmann on April 30, 1998, his examination revealed a 90% improvement in the right facial weakness, full extraocular movement, and no diplopia. (Tr. 345–46.) Because of some remaining tenderness, Dr. Birkmann administered a steroid injection in the right suboccipital region. (Tr. 345.) His assessment was probable viral localized encephalitic process with some brain stem features, improving; right face weakness which may have been mostly a Bell's palsy, 90% improved; and right occipital cervical pain, cause unknown, rule out localized tendinitis. (Tr. 345.)

### D. Hearing Testimony

Vonbusch testified at the June 1998 hearing that she had a number of medical and psychological impairments: nerve damage of the brain and Bell's palsy (Tr. 48–50, 58–59); hypertension (Tr. 68–69); viral encephalitis (Tr. 65); arthritic pain in the hips and shoulders (Tr. 55); seizures (not involving loss of consciousness) (Tr. 55, 59–61); migraine headaches (Tr. 55); insomnia and poor memory (Tr. 53–54); and depression and anxiety (Tr. 48, 62–64). Vonbusch stated that the main reason she could not work was her poor memory. (Tr. 52.)

Vonbusch stated that her Bell's palsy, which began in March 1998, responded to Prednisone treatment and that she no longer suffered from that condition at the time of the hearing. (Tr. 50.) She claimed that her "nerves" were worse

since she had Bell's palsy, causing confusion and memory problems. (Tr. 58–59.) She took Atenenol and Covera for hypertension (Tr. 68–69) and an antibiotic for viral encephalitis (Tr. 65). Dr. Swanson first began giving her Prozac samples in 1997. (Tr. 48.) Prozac helped her depression and anxiety, by giving her a better and more positive attitude. (Tr. 62–63.) She took Chlorazepate for panic attacks, which provided some relief, but caused "sleepiness," dizziness, and memory loss. (Tr. 64.) She also took a medication to help her sleep. (Tr. 54.) Vonbusch testified that she never received psychiatric treatment because she could not afford it, but did talk to an unidentified psychologist or psychiatrist on the telephone several times. (Tr. 56–57.) Vonbusch stated that, because of drowsiness from her medications, she spent most of every day lying down in bed or on the couch. (Tr. 66–67.)

With respect to questions concerning alcohol use, Vonbusch testified that she no longer drank, having "just quit" after seeing the consultative psychologist, Dr. Stone, who had warned her that alcohol was dangerous with the medications she took. (Tr. 70.) Vonbusch claimed that before she quit drinking, she used alcohol only "a couple of times a month" and did not intentionally mix alcohol with her medications. (Tr. 70–71.)

Plaintiff's husband, Dennis Vonbusch, testified at the hearing. (Tr. 72–77.) Mr. Vonbusch stated that Plaintiff spent the day resting because she was up at night because of pain. (Tr. 73.) He testified that he works from 5 a.m. to 3 or 5 p.m. and that when he returned from work Plaintiff was usually on the couch with a heating pad. He usually prepared supper, or they went out to a restaurant to eat. (Tr. 73.) Mr. Vonbusch stated that he and Plaintiff went driving on weekends. (Tr. 73–74.) They did not do as much socially as they used to because of Plaintiff's condition. (Tr. 74–75.) Plaintiff did a little gardening, but not as much as she used to. (Tr. 76.) With respect to alcohol use, Mr.

Vonbusch stated that he and Plaintiff no longer drank, and that he had not used alcohol in "close to a year," because he did not want to set a bad example for Plaintiff. (Tr. 76.) Mr. Vonbusch stated that Plaintiff may have used alcohol to excess "once in a while" in the past, although he never knew her to drink in combination with the medication she took. (Tr. 77.)

A vocational expert, Kathleen Lyons, M.S., also testified at the hearing. (Tr. 79–86.) She classified Vonbusch's past relevant work as follows: secretary (sedentary and semi-skilled); receptionist (sedentary and semi-skilled); telemarketing manager (light and semi-skilled); sales clerk (light and semi-skilled); bookkeeper (sedentary and semi-skilled); and claims adjuster (light and semi-skilled). (Tr. 80–81, 201.)

The ALJ asked the vocational expert a hypothetical question, which included no physical restrictions and the following nonexertional restrictions: a moderate limitation in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and a moderate limitation in the ability to interact appropriately with the general public as well as to accept instructions and respond appropriately to criticism from supervisors. (Tr. 81–82.) In response to this hypothetical, the vocational expert testified that such a person could perform all six of Vonbusch's past jobs specified above. (Tr. 82.)

### E. Issues on Appeal

On appeal, Vonbusch contends that the ALJ's decision is not consistent with the Social Security Act, policy and regulations, and applicable case law, and that the ALJ's findings of fact are not supported by substantial evidence on the record as a whole, because:

1. The ALJ improperly applied *Polaski v. Heckler*, 751 F.2d 943 (8th Cir. 1994) (subsequent history omitted) in assessing the credibility of her

subjective allegations of disabling physical and mental conditions;

2. The ALJ failed to give appropriate weight to the opinions of her treating physician, Dr. Swanson;

3. The ALJ erred in discounting the testimony of her husband; and

4. The ALJ erred in finding that her migraine headaches, arthritis, and hypertension were non-severe impairments.

## II. DISCUSSION

### A. Standard of Review

■ A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole. *Hogan v. Apfel,* 239 F.3d 958, 960–61 (8th Cir. 2001). This standard of review has been described as follows:

Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. In determining whether existing evidence is substantial, we consider evidence that detracts from the Commissioner's decision as well as evidence that supports it. We may not reverse the Commissioner's decision merely because substantial evidence supports a contrary outcome.

*Id.* (quoting *Prosch v. Apfel,* 201 F.3d 1010, 1012 (8th Cir.2000) (internal quotations and citations omitted).) This court must also review the decision of the Commissioner to decide whether the proper legal standard was applied in reaching the result. *Smith v. Sullivan,* 982 F.2d 308, 311 (8th Cir.1992). Issues of law are reviewed de novo. *Olson v. Apfel,* 170 F.3d 820, 822 (8th Cir.1999); *Boock v. Shalala,* 48 F.3d 348, 351 n. 2 (8th Cir.1995); *Smith,* 982 F.2d at 311.

### B. ALJ's Assessment of Plaintiff's Credibility

Vonbusch asserts that the ALJ failed to properly consider the *Polaski* factors when the ALJ discredited her subjective allegations of disabling physical and mental conditions. Vonbusch argues that although the ALJ cited *Polaski,* she did not follow the *Polaski* criteria or provide meaningful discussion of the evidence as it related to each of those criteria. I will set forth the factors an ALJ must consider when assessing a claimant's credibility before turning to Vonbusch's argument that the ALJ did not properly assess her credibility.

■ First, I address the substance of what the ALJ must consider in assessing credibility. It is well-established that an ALJ must consider the *Polaski* factors when assessing a claimant's credibility. The *Polaski* factors consist of "all of the evidence, including prior work records and observations by third parties and doctors regarding daily activities, the duration, frequency, and intensity of pain, precipitating and aggravating factors, the dosage, effectiveness and side effects of medication, and functional restrictions." *Lowe v. Apfel,* 226 F.3d 969, 971–72 (8th Cir.2000) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir.1984)) (subsequent history omitted). Although an ALJ "may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, . . . the complaints may be discounted based on inconsistencies in the record as a whole." *Id.* (citing *Polaski* ). *Accord, Hutton v. Apfel,* 175 F.3d 651, 655 (8th Cir.1999).

■ Second, I address whether the ALJ's credibility assessment must take a particular form. Specifically, I consider whether the ALJ's opinion must include a separate discussion of each *Polaski* factor. For some time, the Eighth Circuit has indicated that an ALJ "must make an express credibility determination detailing the reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the *Polaski* factors." *Kelley v. Callahan,* 133 F.3d 583, 588 (8th Cir. 1998). While it continues to recite this familiar standard for assessing credibility,

the Eighth Circuit has recently held that although an ALJ who discounts a claimant's subjective complaints must discuss the *Polaski* factors, an ALJ need not "discuss methodically each *Polaski* consideration, so long as [the ALJ] acknowledge[s] and examine[s] those considerations." *Lowe v. Apfel,* 226 F.3d at 971. Recent cases also indicate that the required "acknowledgment" of the *Polaski* factors need not include a separate, detailed analysis of each factor. *Cf. Hogan v. Apfel,* 239 F.3d at 961–62 (in discussing the ALJ's assessment of the credibility of claimant's subjective complaints of pain, the court recited the *Polaski* factors, and stated "[t]he ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole. If an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, we will normally defer to that judgment.") (internal quotations and citations omitted). The Eighth Circuit has rejected the argument that an ALJ improperly considered *Polaski* factors by focusing on the factors that supported his findings and disregarding the factors that weighed in the claimant's favor, reasoning as follows:

> Although the ALJ did not explicitly discuss each *Polaski* factor in á methodical fashion, he acknowledged and considered those factors before discounting [the claimant's] subjective complaints of pain.... "An arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where ... the deficiency probably had no practical effect on the outcome of the case."

**3.** I need not consider whether the ALJ must make an express credibility determination, as the ALJ in the case before me made an express determination. In this regard, however, I note that recent Eighth Circuit decisions on this question appear to be in conflict. *Compare Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir.2000) (lack of express determination of claimant's credibility by ALJ did not require reversal of denial of benefits when ALJ implicitly made credibility determination by acknowledging *Polaski* factors and identifying

*Brown v. Chater,* 87 F.3d 963, 966 (8th Cir.1996) (quoting *Benskin v. Bowen,* 830 F.2d 878, 883 (8th Cir.1987)).[3]

In summary, an ALJ who discredits a claimant's testimony has properly assessed that claimant's credibility if the ALJ makes an express credibility determination, acknowledges and considers the *Polaski* factors, and details the reasons for discrediting the testimony by setting forth the inconsistencies between the claimant's subjective complaints and the record as a whole. There is no requirement that each *Polaski* factor be discussed separately and in detail. Applying this standard, I next consider whether the ALJ has properly assessed Vonbusch's credibility.

█ In the case before me, the ALJ acknowledged that "the Claimant's medically determinable impairments could reasonably be expected to produce the type of symptoms, i.e., depressed mood, anxiety, episodes of crying, memory problems, confusion, feelings of hopelessness, joint pain, and headaches described during the courts of her testimony" and observed that the question was whether Vonbusch experienced these symptoms in such intensity, frequency, and duration as would preclude all type of substantial and gainful work activity. (Tr. 22–23.) However, the ALJ expressly found that Vonbusch's testimony, "insofar as it pertained to the inability to perform virtually any type of work activity on a sustained basis, was not credible." (Tr. 25.) The ALJ acknowledged the *Polaski* factors by listing them. (Tr. 20–22.) She detailed her reasons for discrediting Vonbusch's subjective complaints of disabling physical and mental conditions

inconsistencies between claimant's testimony and the evidence in the record as a whole; lack of express determination was "a deficiency in opinion writing that does not require reversal because the ultimate finding is supported by substantial evidence in the record.") *with Lowe v. Apfel,* 226 F.3d at 971 ("The ALJ was required to make an express credibility determination explaining why he did not fully credit [the claimant's] complaints.").

by setting forth inconsistencies between Vonbusch's testimony and the record as a whole. (Tr. 22–25.) In detailing those inconsistencies, the ALJ noted only the *Polaski* factors that supported her credibility finding.

The ALJ found that the objective medical evidence did not support Vonbusch's allegations of debilitating emotional disorders, arthritic pain, headaches and seizures (Tr. 23) for three reasons. First, although Vonbusch took Prozac and Tranzene prescribed by Dr. Swanson, there was no evidence that Vonbusch had required active treatment or counseling for an emotional disorder, and Vonbusch had never sought a consultative psychiatric or psychological evaluation. (Tr. 23.) Second, the opinions in the forms completed by Dr. Swanson were inconsistent with or unsupported by the record as a whole. (Tr. 23–25.) The ALJ expressly noted these inconsistencies: although Dr. Swanson indicated he had treated Vonbusch for at least 20 years, progress notes related to the alleged disability were "very limited" (Tr. 24) and although Dr. Swanson claimed that Vonbusch had been seen by "several specialists" (Tr. 243 (Ex. 5F/3)), there was evidence of only one instance of treatment by a specialist-treatment by Dr. Birkmann in March and April 1998 for Bell's palsy (Tr. 24). (Though not noted by the ALJ, the record also indicates that Dr. Swanson's statement that Vonbusch had been seen by several specialists was made in January 1998, *prior* to her treatment by a specialist.) Third, in the forms relating to Vonbusch's exertional and nonexertional limitations, Dr. Swanson indicated that Vonbusch had a variety of limitations and restrictions, yet those limitations and restrictions were not supported by Dr. Swanson's limited progress notes or by the medical evidence as a whole. (Tr. 25.) (More detail on reasons for discrediting Dr. Swanson's opinions is found in the following section of this opinion.)

 Case law supports the ALJ's determination to reject Vonbusch's allegations of debilitating emotional disorders, arthritic pain, headaches and seizures for the reasons noted by the ALJ. The Eighth Circuit has indicated that when objective medical evidence fails to document a disabling impairment, complaints of disabling pain are properly discredited. *Brown v. Chater,* 87 F.3d at 965. *Accord, Ward v. Heckler,* 786 F.2d 844, 847 (8th Cir.1986) ("Although an adjudicator may not discount a claimant's subjective complaints solely because they are not supported by the objective medical evidence, the absence of such evidence is one factor to be considered in evaluating the credibility of the claimant's testimony and complaints.") (citing *Polaski v. Heckler,* 751 F.2d at 948). Furthermore, "[a] claimant's allegations of disabling pain may be discredited by evidence that the claimant has received minimal medical treatment and/or has taken only occasional pain medications...." *Singh v. Apfel,* 222 F.3d 448, 453 (8th Cir.2000) (citing *Kelley v. Callahan,* 133 F.3d 583, 589 (8th Cir.1998)).

 The ALJ also found that Vonbusch's testimony contained a significant contradiction[4] which reflected poorly on her credibility: although she claims total disability, subsequent to the alleged onset date of her claimed disability Vonbusch applied for and received unemployment compensation. (Tr. 24.) In applying for unemployment compensation, Vonbusch certified to the State of Nebraska that she was ready, willing, and able to work. This is inconsistent with her assertion that she was totally disabled. The Eighth Circuit has held that applying for unemployment benefits is some evidence, though not conclusive evidence, to negate a claim of disability. *Johnson v. Chater,* 108 F.3d 178, 180 (8th Cir.1997) ("[A] claimant may admit an ability to work by applying for unemployment compensation benefits be-

---

4. The ALJ's opinion stated that Vonbusch's testimony contained "significant contradictions" but expressly noted only one contra-

diction: that arising from application for and receipt of unemployment compensation during the period of alleged disability.

cause such an applicant must hold himself out as available, willing, and able to work.") (quoting *Jernigan v. Sullivan*, 948 F.2d 1070, 1074 (8th Cir.1991)). *See also, Bentley v. Shalala*, 52 F.3d 784, 786 (8th Cir.1995) (when there was conflicting medical evidence as to disability, claimant's record of contemplating work as evidenced by application for jobs during claimed disability period "indicates [the claimant] did not view his pain as disabling," observing that this situation "must be distinguished from situations where the medical evidence uniformly supports a finding of disability; in such cases an unsuccessful work search may even reinforce a disability claim.")

Though not expressly noted by the ALJ, other evidence from the hearing supports the ALJ's decision to discredit Vonbusch's testimony. During the six-month period when Vonbusch received unemployment benefits and was required to seek work twice a week as a condition to receipt of benefits, she did so in a desultory manner indicative of a poor work ethic. Vonbusch exerted very little effort to locate employers who were hiring. In fact, during this six month period Vonbusch never submitted an employment application to an employer that was hiring. (Tr. 51–53.) The manner in which Vonbusch sought unemployment benefits is the equivalent of poor work history and an unimpressive work record or poor work history can lessen a claimant's credibility. *Woolf v. Shalala*, 3 F.3d at 1214.

I find that the ALJ properly assessed Vonbusch's credibility, as she made an express credibility determination, acknowledged and considered the *Polaski* factors (although noting only those factors that supported her determination) and detailed the reasons for discrediting Vonbusch's testimony by setting forth inconsistencies between Vonbusch's subjective complaints and the record as a whole.

## C. Weight Given by ALJ to Opinions of Plaintiff's Treating Physician, Dr. Swanson

Vonbusch's argument that the ALJ failed to give appropriate weight to the opinions of Dr. Swanson, her treating physician, is very similar to her argument that the ALJ improperly assessed her credibility. Again, Vonbusch argues that the ALJ failed to consider the appropriate factors and that there was no detailed, separate discussion of each factor. Again, I find that Vonbusch's arguments are without merit. I begin by setting forth the relevant criteria for consideration of the appropriate weight to be given a treating physician's opinions. I will then consider whether the ALJ in the case before me gave appropriate weight to the opinions of Dr. Swanson, Vonbusch's treating physician, when she determined that those opinions should be rejected.

### 1. Standards for Consideration of Treating Physician's Opinions

The regulations provide that a treating physician's opinion is granted controlling weight if it is "[1] *well-supported by medically acceptable clinical and laboratory diagnostic techniques* and [2] *not inconsistent with the other substantial evidence* in [the] record." 20 C.F.R. § 404.1527(d)(2) (emphasis added). The Eighth Circuit follows this two-part rule. *See, e.g., Cunningham v. Apfel*, 222 F.3d 496, 502 (8th Cir.2000) ("[The opinion of the treating physician] should be granted controlling weight if it is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with the other substantial evidence in the record."). *Cf. Bentley v. Shalala*, 52 F.3d at 785–86 ("While the opinions of treating physicians are entitled to special weight, they do not automatically control, since the record must be evaluated as a whole.")

The regulations further provide that even if a treating physician's opinion is not given controlling weight, it is still entitled to deference and must be weighed by consideration of the following five factors: (1) the length of the treatment relationship and the frequency of examination; (2) the

nature and extent of the treatment relationship (such as the kinds and extent of examinations and testing); (3) supportability of the opinion (the more a source presents evidence such as medical signs and laboratory findings, the more weight will be given that source's opinion); (4) the consistency of the opinion with the record as a whole; and (5) whether the physician is a specialist, as more weight is given to the opinion of a specialist about medical issues relating to the area of specialty than to the opinion of a source who is not a specialist. 20 C.F.R. § 404.1527(d). *See also* SSR 96–2p, 1996 WL 374188 (S.S.A., July 2, 1996) (policy interpretation explaining regulations on evaluating treating source medical opinions).

### 2. "Controlling Weight" Analysis

The ALJ explicitly rejected the opinions of Dr. Swanson as set forth in Exhibit 5F/2–5 and 18–27 (the opinions regarding exertional and nonexertional limitations) and Dr. Swanson's opinion that Vonbusch has an anxiety disorder which meets Listing 12.06 of Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4. (Tr. 246 (Ex. 5F/6).) The ALJ found as follows:

> Although Dr. Swanson is the Claimant's treating physician, the undersigned [ALJ] has little doubt that the primary basis for the doctor's opinions regarding the severity of the Claimant's limitations and inability to engage in any type of work activity on a sustained basis is based on the Claimant's subjective complaints and reported limitations rather than on objective clinical findings, diagnostic testing and psychological evaluation and testing.

(Tr. 25.) Implicit in the ALJ's finding that Dr. Swanson's opinions should be rejected are findings that Dr. Swanson's opinion should not be granted controlling weight or deference.

Dr. Swanson's opinions are entitled to controlling weight only if they are "well-supported by medically acceptable clinical and laboratory techniques and . . . not in-

consistent with the other substantial evidence in the record." *Cunningham v. Apfel*, 222 F.3d at 502; 20 C.F.R. § 404.1527(d)(2). Under this standard, Dr. Swanson's opinions were not entitled to controlling weight.

 The ALJ found that the primary basis for Dr. Swanson's opinions was Vonbusch's subjective complaints and reported limitations rather than on objective clinical findings, diagnostic testing and psychological evaluation. (Tr. 25.) In so finding, the ALJ indicated that she did not consider Dr. Swanson's opinions to be well-supported by medically acceptable clinical and laboratory diagnostic techniques. I agree. An ALJ may properly disregard the opinions of a treating physician to the extent they are based on the claimant's subjective descriptions of pain levels. *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir.2000) (in assessing claimant's RFC, ALJ was entitled to disregard treating physician's opinion that claimant's ability to reach, push, or pull was limited by pain, in part because such opinion was based on subjective descriptions to physician of claimant's pain levels); *Rankin v. Apfel*, 195 F.3d 427, 430 (1999) (although a treating physician's opinion is normally entitled to great weight, it was appropriate to discredit treating physician's testimony when it was based heavily on claimant's subjective complaints and at odds with the weight of the objective evidence); *Gaddis v. Chater*, 76 F.3d 893, 895–96 (8th Cir.1996) (ALJ may discount physician's opinion if it is based on discredited subjective complaints); *Woolf v. Shalala*, 3 F.3d at 1214 (ALJ was justified in discrediting opinion of disability by treating physician on ground that it was based solely on claimant's complaints of pain and was unsupported by physician's other findings).

The ALJ also implicitly found that Dr. Swanson's opinions were inconsistent with the other substantial evidence in the record. As to Vonbusch's emotional disorders, the ALJ noted these inconsistencies:

(1) there are three reports of mental status examinations in the record which indicate that there is no evidence that Vonbusch has a thought disorder and that Vonbusch appeared alert and well-functioning (Tr. 23: referencing Ex. 4F/5 (Dr. Stone's report on consultative exam), Ex. 9F/6 (March 19, 1998 consultative report of Dr. Birkmann conducted at Bryan Hospital), and Ex. 10F/43 (report of April 7, 1998 followup visit to Dr. Birkmann)); (2) after a consultative psychological examination, Dr. Stone opined that Vonbusch had no substantial permanent impairment (Tr. 23, referencing Ex. 4F/7); and (3) a MRI study of Vonbusch's brain revealed no abnormalities and no objective evidence to support Vonbusch's allegation of seizures (Tr. 23, referencing Ex. 10F/14).

The ALJ also found no objective medical evidence of musculoskeletal complaints. A March 1996 x-ray of Vonbusch's left hip was negative. (Tr. 23, referencing Ex. 2F/22.[5]) A March 1998 x-ray of Vonbusch's cervical spine was also negative. (Tr. 23, referencing Ex. 9F/14.) The ALJ also noted that the record contains five medical observations that Vonbusch walks with a normal gait, has good strength, and no restriction of motion in the upper and lower extremities. (Tr. 23, referencing Ex. 3F/2 (observation of Dr. Swanson on September 30, 1997), Ex. 4F/1 (observation of Dr. Stone on November 3, 1997), Ex. 9F/9,21 (observations of Dr. Rounsborg on March 16 and 19, 1998), and Ex. 10F/36 (observation of Dr. Birkmann on April 30, 1998).)

The ALJ also noted that an extensive workup during Vonbusch's March 1998 hospital treatment for possible Bell's palsy and a probable viral localized encephalitic process revealed completely normal results. The workup included laboratory studies, a MRI study, an ECG and visually evoked potentials and brain stem auditory evoked responses. (Tr. 23, referencing Ex. 9F/2.) [6]

If the medical evidence cited by the ALJ as contradictory to Dr. Swanson's opinions is "substantial evidence," then the ALJ was correct to refuse to grant Dr. Swanson's opinions controlling weight. I conclude that the evidence cited by the ALJ as contradictory to Dr. Swanson's opinions is substantial evidence.

▮▮▮ Although Dr. Stone was a consulting physician, under the circumstances his opinion is substantial evidence to refute Dr. Swanson's opinions. Although as a general matter the report of a one-time consulting physician does not constitute substantial evidence on the record as a whole, especially when contradicted by the opinion of the claimant's treating physician, this general rule has two exceptions. The first exception applies when other medical assessments are supported by better or more thorough medical evidence. *Cantrell v. Apfel,* 231 F.3d 1104, 1107 (8th Cir.2000) (quoting *Rogers v. Chater,* 118 F.3d 600, 602 (8th Cir.1997)). The second exception applies when a treating physician renders inconsistent opinions that undermine the credibility of those opinions.

---

**5.** This reference is in error. The March 1996 x-ray (Ex. 2F/11) is located at Tr. 220.

**6.** The ALJ also noted that Dr. Swanson's opinions appeared in "reports" which consisted primarily of responses to a checklist and implied that Dr. Swanson's opinions should be discounted or rejected because they were expressed in checklist form. (Tr. 24) (citing *O'Leary v. Schweiker,* 710 F.2d 1334, 1341 (8th Cir.1983) for the proposition that opinions expressed in checklist form are entitled to little weight). However, *O'Leary* in fact stands for the proposition that a checklist used by a non-treating physician to deny disability benefits will be given little weight when it conflicts with the records of the treating physician. *Gutzman v. Apfel,* 109 F.Supp.2d 1129, 1134 (D.Neb.2000). I do not find that Dr. Swanson's opinions were properly rejected because they were expressed in checklist form, but rather that they were properly rejected because they were not well-supported by medically acceptable clinical and laboratory techniques and were inconsistent with the other substantial evidence in the record.

*Id.* The case before me falls under both exceptions.

The first exception applies here, as other medical evaluations of Vonbusch were more thorough than those of Dr. Swanson. Dr. Stone's mental evaluation of Vonbusch was far more thorough than Dr. Swanson's conclusory opinion, and Vonbusch admitted to Dr. Stone that Dr. Swanson was unaware of her drinking problems. *See* note 6, *supra.* Under these circumstances, it was appropriate to reject Dr. Swanson's opinion as to Vonbusch's mental status. *See* Carolyn A. Kubitschek, *Social Security Disability: Law and Procedure in Federal Court* § 2:35 (2000 Supp. at p. 34) (citing cases, among them *Wilson v. Apfel,* 172 F.3d 539, 542 (8th Cir.1999)) ("The opinion of a treating physician is entitled to little weight if it is conclusory and not supported by medical evidence. In such a situation, *the opinion of a consulting physician may constitute substantial evidence to refute the treating physician's opinion.*") (emphasis added). *See also, Davis v. Schweiker,* 671 F.2d 1187, (8th Cir.1982) (when evidence from non-treating physician is compatible with other evidence of record, and treating source's evidence is conclusory and conflicting, then the general rule that reports of nonexamining physicians deserve little weight in light of evidence to the contrary is inapplicable). In addition, Dr. Swanson was not Vonbusch's only treating physician. Drs. Rounsborg and Birkmann were also treating Vonbusch. Their notes are more detailed than those of Dr. Swanson, and are supported by extensive medical tests. Accordingly, their evaluations of Vonbusch's physical condition are substantial evidence and should be credited over that of Dr. Swanson. *Prosch v. Apfel,* 201 F.3d 1010, 1014 (8th Cir.2000) ("[A]n ALJ may credit other medical evaluations over that of the treating physician when such other assessments 'are supported by better or more thorough medical evidence.' ") (citing *Rogers,* 118 F.3d at 602).

The second exception also applies as to a portion of Dr. Swanson's opinion. Dr. Swanson's September 20, 1997 observation that Vonbusch had an adequate range of motion in her extremities (Tr. 229) is inconsistent with his January 1998 opinion that Vonbusch was unable to sit, stand and/or walk for even one hour in a work day and that she was unable to bend, squat, crawl, climb, reach above shoulder level, or use her hands to perform fine motor skills (Tr. 262–67). *Woolf v. Shalala,* 3 F.3d at 1214 (noting that treating physician's later opinion of disability discredited that physician's earlier statement that he had found no neuromuscular abnormalities and claimant continued to be ambulatory).

Vonbusch would prefer that the ALJ's opinion explicitly cite the regulations on evaluating treating source medical opinions and make an explicit finding that Dr. Swanson's opinions are or are not entitled to controlling weight. Though Vonbusch might prefer it, this level of detail is not required. An explicit finding that a treating physician's opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques is not a prerequisite to a determination that the treating physician's opinion should not be given controlling weight. *Prosch v. Apfel,* 201 F.3d at 1014 ("Although a finding that a treating physician's opinion is not so supported [well-supported by medically acceptable clinical and laboratory diagnostic techniques] may in certain circumstances support the discrediting of a treating physician's evaluation, we do not believe that such a finding is required.") (emphasis added) (citing 20 C.F.R. § 404.1527(d)(2).) *See also, Young v. Apfel,* 221 F.3d at 1068 (lack of express determination of claimant's credibility did not require reversal when ALJ implicitly made a credibility determination.)

### 3. Deference Analysis

■ Even if Dr. Swanson's opinions are not entitled to controlling weight, they are entitled to deference and must be

weighed by consideration of five factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship (such as the kinds and extent of examinations and testing); (3) supportability of the opinion (the more a source presents evidence such as medical signs and laboratory findings, the more weight will be given that source's opinion); (4) the consistency of the opinion with the record as a whole; and (5) whether the physician is a specialist, as more weight is given to the opinion of a specialist about medical issues relating to the area of specialty than to the opinion of a source who is not a specialist. 20 C.F.R. § 404.1527(d). *See also* SSR 96–2P, 1996 WL 374188 (S.S.A., July 2, 1996) (policy interpretation explaining regulations on evaluating treating source medical opinions).

Vonbusch asserts that Dr. Swanson's opinions should be given deference because she had a 20–year treatment relationship with him and because those opinions are supported by her subjective complaints. I disagree. I have already found that the ALJ was correct to reject Vonbusch's testimony as to her subjective complaints. I also note that the length of treatment relationship is only one of the five factors and the other factors point to rejection of Dr. Swanson's opinion.

The ALJ did not enumerate the five factors to consider in determining what deference to give a treating physician's opinion and then apply the facts to those factors. However, since the ALJ correctly noted the relevant facts, the deficiency, if any, in her opinion-writing does not require reversal. *See Benskin v. Bowen*, 830 F.2d 878, 883 (8th Cir.1987) ("An arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where, as here, the deficiency probably had no practical effect on the outcome of the case.").

The ALJ correctly noted the limited nature of Dr. Swanson's treatment notes, all of which are located at Tr. 229–33 and Tr. 363–64 (excluding duplications). Dr. Swanson's sketchy progress notes are accompanied by a limited number of clinical findings, and no diagnostic testing other than blood pressure readings. Nothing in the record supports Dr. Swanson's opinions other than Vonbusch's discredited subjective reports. The lack of progress notes or objective testing to support Dr. Swanson's opinions indicates that Dr. Swanson's opinions should be discounted. *Hogan v. Apfel*, 239 F.3d at 960–61 (no error to discount limitations noted in treating physician's medical source statement when those limitations were not mentioned in progress notes or supported by objective testing). Furthermore, the Eighth Circuit has recently indicated that when a treating physician's opinion is not supported by that physician's own findings or diagnostic data, then it can be said that the evidence in the record as a whole contradicts the treating physician's opinion. *Davis v. Apfel*, 239 F.3d 962, 966–67 (8th Cir.2001); *Haggard v. Apfel*, 175 F.3d at 595. In any event, I have already found that Dr. Swanson's opinions were contradicted by the evidence in the record as a whole. By contrast to Dr. Swanson's sketchy treatment notes and minimal examination and treatment of Vonbusch, the doctors treating Vonbusch at Bryan Hospital (Drs. Rounsborg and Birkmann) performed extensive examinations and ordered various diagnostic tests, none of which indicated disabilities of listing-level severity. In addition, the findings of Dr. Stone (the consulting physician) are supported by detailed notes and the statement by Vonbusch to Dr. Stone that she had not told Dr. Swanson about her drinking habits or her use of alcohol for analgesic purposes. (Tr. 236.) In sum, the opinions of Drs. Rounsborg, Birkmann, and Stone should be given more weight than those of Dr. Swanson.

Dr. Swanson's opinion that Vonbusch suffers from listing-level anxiety disorder is entitled to little weight. He is not a

mental health professional. *Craig v. Apfel,* 212 F.3d 433, 436 (8th Cir.2000) (approving ALJ's discrediting of treating physician's observation that claimant suffered from moderate depression because treating physician was not licensed as a mental health professional and opinions outside the physician's field of expertise carry little weight) (citing *Loving v. Dep't of Health & Human Svcs.,* 16 F.3d 967, 971 (8th Cir. 1994)).

In the case before me, the ALJ adequately supported her rejection of Dr. Swanson's opinions. Her opinion addresses the appropriate factors to be considered in evaluating opinions of a treating physician and reaches a conclusion supported by the evidence in the record as a whole. This is all that is required.

### C. ALJ Erred in Discounting the Testimony of Plaintiff's Husband

■ Mr. Vonbusch testified that Plaintiff is frequently unable to sleep at night due to pain and headaches and spends her days resting. He works from 5 a.m. to 3 or 4 p.m. When he returns from work, Vonbusch is lying on the sofa with a heating pad or "some medication." (Tr. 73.) Mr. Vonbusch acknowledged that he and Vonbusch have a history of drinking and becoming intoxicated, but claimed that they had not consumed any alcohol for one year. (Tr. 76–77.)

The ALJ explicitly found that Mr. Vonbusch's testimony was not entitled to significant weight for three reasons. (Tr. 26.) First, much of Mr. Vonbusch's testimony was based on his wife's reported medical condition. Since Plaintiff lacked credibility, her husband's testimony also lacks credibility to the extent it is based on her subjective reports. *See Lorenzen v. Chater,* 71 F.3d 316, 319 (8th Cir.1995) (lay witness testimony may be discredited by the same evidence that discredited the claimant's own testimony). Second, as Mr. Vonbusch worked outside the home for most of the day, it was clear that much of his testimony was not based on personal observation. Third, his testimony regarding Plaintiff's abstinence from alcohol for at least one year was contradicted by Plaintiff's own report to Dr. Stone in November 1997 that she continues to excessively consume alcohol, drinks as a form of self-medication "when the pain killers don't work" and "doesn't know when to quit." (Ex. 4F/2). These are adequate reasons to discount Mr. Vonbusch's testimony. *See Harris v. Apfel,* 198 F.3d 250 (table), 1999 WL 972159, at *1 (8th Cir. Oct.18, 1999) (ALJ properly supported finding that testimony of claimant's spouse was not credible by finding that the testimony was based on an "uncritical acceptance" of claimant's complaints and was prompted by spouse's desire for claimant to receive benefits).

### D. ALJ's Finding that Plaintiff's Migraine Headaches, Arthritis, and Hypertension were Non Severe Impairments

■ Vonbusch argues that the ALJ erred by not finding her migraine headaches, arthritis, and hypertension to be "severe" impairments. An impairment is "not severe" when it is so slight that it is unlikely to result in disability even when a claimant's age, education, and experience are taken into account. *See Bowen v. Yuckert,* 482 U.S. 137, 153–54, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). A "not severe" finding is appropriate if the evidence fails to establish that an impairment or combination of impairments has more than a minimal effect on a claimant's ability to perform basic work-related activities. *See Nguyen v. Chater,* 75 F.3d 429, 431 (8th Cir.1996). *See also* 20 C.F.R. §§ 404.1521 and 416.921 (2000).

Although Vonbusch claimed in her testimony that she had migraines "nearly every day" (Tr. 55), migraine headaches are rarely mentioned in the medical record, and then only as a subjective complaint with no medical diagnosis or objective findings. There is no documentation of headache complaints in Dr. Swanson's treat-

ment notes from December 1995 (Tr. 232), March 1996 (Tr. 232), August 1996 (Tr. 232), October 1996 (Tr. 231), November 1996 (Tr. 231), February 1997 (Tr. 230), June 1997 (Tr. 230), March 1998 (Tr. 363), May 1998 (Tr. 363) or June 1998 (Tr. 363). In fact, migraines are mentioned only once in any of Dr. Swanson's treatment notes: on September 30, 1997, Dr. Swanson noted that Vonbusch complained of migraine headaches occurring two or three times a week. (Tr. 229.) It is unclear whether the headaches of which Vonbusch complained to Dr. Swanson were in fact "migraines." Dr. Swanson's notes contain no clinical findings regarding the headaches and do not acknowledge that Vonbusch was abusing alcohol heavily two to three times a week during the time she reported experiencing migraines two to three times a week. (Tr. 235 (statement by Vonbusch to Dr. Stone).) [7] Although Dr. Swanson completed a checklist on which he indicated "migraines" were one of Vonbusch's impairments (Tr. 242), he included no clinical or diagnostic data to support this diagnosis (and, as I have previously indicated, the ALJ properly discredited Dr. Swanson's opinions). In March 1998, Vonbusch's complaints of head and face pain and numbness were variously attributed by Dr. Birkmann to possible cranial neuritis, Bell's palsy, a localized encephalitic process, or right occipital cervical pain of unknown cause. Dr. Birkmann did not diagnose migraine headaches (see, e.g., Tr. 305–06, 345, 355) and the symptoms had largely improved by April 30, 1998 (Tr. 345–46). Taken as a whole, the evidence does not support Vonbusch's contention that her headaches, migraine or otherwise, constitute a "severe" impairment.

Neither is there any evidence to support Vonbusch's claim that she had "severe" arthritis. There is no objective medical evidence to support a diagnosis of arthri-

tis. An x-ray of the left hip in March 1996 was negative (Tr. 220), as was an x-ray of the cervical spine in March 1998. (Tr. 299.) In September 1997, Dr. Swanson noted that Vonbusch had an adequate range of motion in all extremities. (Tr. 229.) In November 1997, Dr. Stone noted no "gross peculiarities of posture or gait." (Tr. 234.) In March 1998, Dr. Rounsborg found that Vonbusch had good strength and range of motion of the extremities. (Tr. 294, 306.) The same month, Dr. Birkmann noted that Vonbusch had full strength in both upper and lower extremities, with normal reflexes. (Tr. 291.) One month later, in April 1998, Dr. Birkmann noted that Vonbusch had a normal gait. (Tr. 345.) Although Dr. Swanson listed arthritis as one of Vonbusch's impairments on one of the forms he completed in January 1998, he did not provide any clinical or diagnostic data to support that diagnosis or to indicate the severity of the condition (Tr. 242) (and, as I have previously indicated, the ALJ properly discredited Dr. Swanson's opinions). Taken as a whole, the evidence does not support Vonbusch's contention that she suffered from "severe" arthritis, or indeed that she suffered from any form of arthritis.

Vonbusch's hypertension was also not a "severe" impairment. The record establishes that Vonbusch's blood pressure was controlled by medication, evidenced by the fact that the majority of the documented blood pressure readings are at normal or near normal levels (see, e.g., footnote 2 supra and Tr. 214, 229, 231–32). Dr. Swanson characterized the effectiveness of Vonbusch's hypertension medication as "good to fair" with no side effects. (Tr. 242.) The evidence does not support a finding that Vonbusch suffered from "severe" hypertension.

The evidence on the record as a whole supports a finding that Vonbusch's head-

---

**7.** Vonbusch told Dr. Stone that she never told Dr. Swanson about her ongoing alcohol abuse. (Tr. 234, 236, 238.) Dr. Swanson was apparently unaware of Vonbusch's alcohol abuse, as it was not mentioned in any of his treatment notes or on any of the various physical and mental capacity checklists he submitted on Vonbusch's behalf. (Tr. 229–33, 242–67, 363–64.)

aches, arthritis, and hypertension posed no more than "slight or minimal" limitations on Vonbusch's ability to perform work activities, and therefore were not "severe" impairments under the regulations.

## III. CONCLUSION

I find that substantial evidence on the record as a whole supports the Commissioner's decision to deny benefits.

Accordingly,

IT IS ORDERED that judgment shall be entered by separate document providing that the final decision of the Commissioner is affirmed pursuant to sentence four of 42 U.S.C. § 405(g).

## JUDGEMENT

Pursuant to the court's memorandum and order filed this date, the final decision of the Commissioner is affirmed pursuant to sentence four of 42 U.S.C. § 405(g).